IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| THOMAS A. POWELL, Individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § § § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, LOCAL UNION NO. 502, LOCAL UNION NO. 512, LOCAL UNION NO. 513, LOCAL UNION NO. 514, LOCAL UNION NO. 541, LOCAL UNION NO. 542, LOCAL UNION NO. 567, LOCAL UNION NO. 568, LOCAL UNION NO. 570, LOCAL UNION NO. 571, LOCAL UNION NO. 572, LOCAL UNION NO. 574, LOCAL UNION NO. 575, LOCAL UNION NO. 576, and LOCAL UNION NO. 591, | § § § § § § § § § § § § § § § § § | C.A. NO. _____ |
| Defendants | § § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiff Thomas A. Powell ("Powell" or "Plaintiff"), individually and on behalf of

all those similarly situated, brings this action for an injunction and damages and states:

## I. INTRODUCTORY STATEMENT

This case arises out of the exclusion of certain members of the Transport Workers

Union of America, AFL-CIO ("TWU") from an equity distribution by the American Airlines Group, Inc. to TWU.  In August 2012, the TWU settled certain disputes with American Airlines and American Eagle (collectively, "American") (which were in Chapter 11 bankruptcy) via a Letter Agreement.  The Letter Agreement concluded the parties' agreed modifications to the collective bargaining agreements between American and TWU.  Two of these modifications were (1) an agreed Reduction in Force ("RIF"); and (2) an award of equity in the American Airlines Group, Inc. when it emerged from Bankruptcy (the "TWU Equity" in "New American").  The RIF prevented involuntary furloughs; certain employees were enticed to take early separation ("Early Separation") instead.  The TWU Equity stemmed from a so-called "Me, Too" provision in the collective bargaining agreements that required New American to give the TWU equal treatment to the other unions that also received equity in New American.

Rather than simultaneously effectuate the Early Separation and TWU Equity programs, the TWU Locals required Plaintiff and the proposed class to immediately decide whether to enroll in Early Separation.  It was not until August 2013 that the Defendants informed the persons who took Early Separation that Defendants had decided to deny Plaintiff and the proposed class their previously-vested rights to the TWU Equity. The Defendants did this in direct contravention of advice from the TWU International President.

Powell brings this action for himself and for a proposed class of TWU members who enrolled in Early Separation between November 29, 2011 and July 26, 2013, to enjoin distribution of any of the undistributed TWU Equity, require distribution of the

TWU Equity to the proposed class, and for any damages or other relief to which they are entitled.

## II. PARTIES

1. **Powell.** Thomas A. Powell is an individual residing in Tulsa, Oklahoma. He is typical of the Class insofar as he was a member of TWU in good standing at the time of the Letter Agreement, and was not advised he would be excluded from the TWU Equity distribution if he participated in Early Separation.

2. **TWU International.** TWU International refers to the Transportation Workers Union of America, AFL-CIO, which is an unincorporated United States labor union that represents, for purposes of the Railway Labor Act (the "RLA"), over 200,000 members and retirees, primarily in commercial aviation, public transportation, and passenger railroads. Included in the union's membership are approximately 26,000 workers at American. TWU International's president, James Little ("Little"), negotiated the Letter Agreement and advocated that the TWU Equity be shared with all TWU members affected by the collective bargaining agreements. Plaintiff sues TWU International primarily to preserve any rights he may have for any involvement of TWU International in the decision to exclude Plaintiff and the proposed class from the TWU Equity, or unlawful abdication of any responsibility TWU International may have had to prevent the Defendant Local Unions from violating the rights of TWU members. TWU's principal office is located at 501 3rd Street NW, Ninth Floor, Washington, D.C. 20001. TWU may be served through any of its registered officers pursuant to Fed. R. Civ. P. 4(h)(b).

3.      __Local Union 502.__  Local Union 502 is an unincorporated association and labor organization.  Local Union 502 may be served at its principal office and place of business located at 215 Richmond Street, El Segundo, CA 90245.

4.      __Local Union 512.__  Local Union 512 is an unincorporated association and labor organization.  Local Union 512 may be served at its principal office and place of business located at 650 E. Devon Ave., Suite 170, Itasca, IL 60143.

5.      __Local Union 513.__  Local Union 513 is an unincorporated association and labor organization.  Local Union 513 may be served on its registered agent, Darrel Kizer, at 759 N. Kimball Road, Southlake, TX 76092.

6.      __Local Union 514.__  Local Union 514 is an unincorporated association and labor organization.  Local Union 514 may be served at its principal office and place of business located at 11945 E. Pine Street, Tulsa, OK 74116.

7.      __Local Union 541.__  Local Union 541 is an unincorporated association and labor organization.  Local Union 541 may be served at its principal office and place of business located at 1201 Airport Freeway, Suite 386, Euless, TX 76040.

8.      __Local Union 542.__  Local Union 542 is an unincorporated association and labor organization.  Local Union 542 may be served at its principal office and place of business located at 1201 Airport Freeway, Suite 386, Euless, TX 76040.

9.      __Local Union 567.__  Local Union 567 is an unincorporated association and labor organization.  Local Union 567 may be served on its registered agent, Robert W. Kirk, at 2050 Golden Triangle Drive, Fort Worth, TX 76177.

10. **Local Union 568.**  Local Union 568 is an unincorporated association and labor organization.  Local Union 568 may be served at its principal office and place of business located at 5395 NW 36th Street, Miami Springs, FL 33166.

11. **Local Union 570.**  Local Union 570 is an unincorporated association and labor organization.  Local Union 570 may be served at its principal office and place of business located at 6355 NW 36th Street, Suite 301, Virginia Gardens, FL 33166.

12. **Local Union 571.**  Local Union 571 is an unincorporated association and labor organization.  Local Union 571 may be served at its principal office and place of business located at 10000 West O'Hare Avenue, Chicago, IL 60666.

13. **Local Union 572.**  Local Union 572 is an unincorporated association and labor organization.  Local Union 572 may be served at its principal office and place of business located at 5239 Mulford, Skokie, IL 60077.

14. **Local Union 574.**  Local Union 574 is an unincorporated association and labor organization.  Local Union 574 may be served at its principal office and place of business located at 36 Longyear Drive, Negaunee, MI 9866.

15. **Local Union 575.**  Local Union 575 is an unincorporated association and labor organization.  Local Union 575 may be served on its registered agent, United States Corporation Agents, Inc., at 9900 Spectrum Drive, Austin, TX 78717.

16. **Local Union 576.**  Local Union 576 is an unincorporated association and labor organization.  Local Union 576 may be served at its principal office and place of business located in Grapevine, TX.

17.   **Local Union 591.**  Local Union 591 is an unincorporated association and labor organization.  Local Union 591 may be served at its principal office and place of business located at 4005 Gateway Drive, Suite 200, Colleyville, TX 76034.

## III.  JURISDICTION AND VENUE

18.   **Subject Matter Jurisdiction.**   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this case is filed as a class action under Fed. R. Civ. P. 23 and on information and belief the aggregate amount in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.  There is also subject matter jurisdiction under 28 U.S.C. § 1331 because the case arises under the Constitution, laws or treaties of the United States.

19.   **Venue.**  Venue is proper in this district under 28 U.S.C. § 1391(b) because (1) a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district; and (2) one or more Defendants are subject to personal jurisdiction in this District.   Venue is also proper under 29 U.S.C. § 185(a) because Defendants are subject to personal jurisdiction and duly authorized officers are engaged in representing or acting for members in this district.

## IV.  BACKGROUND FACTS

20.   **TWU International.**  TWU International is an unincorporated association that functions through Local Unions and represents over 200,000 individual members, primarily in commercial aviation, public transportation, and passenger railroads.

21.     **The Local Union Defendants.**  The Local Union Defendants consist of the members within a city or other area specified by the TWU International Executive Council.  Subject to the provisions of the TWU International Constitution and the by-laws of the Local Unions and to all delegations of authority and assignments of responsibility to the Local Officers and to the Local Executive Board as provided in the International Constitution and Local by-laws, the supreme authority in the Local Unions is the membership of the Local Union, acting through duly called meetings.  The Defendants represented the proposed class of persons employed at American.

22.     **The Seven TWU Crafts.**  TWU's membership working at American is divided into seven "crafts" or "classes," which are as follows: (1) Aviation and Plant Maintenance Employees, (2) Fleet and Ground Service Employees, (3) Material Logistics Specialists, (4) Maintenance Control Technician Employees, (5) Flight Dispatchers and Dispatcher's Assistants, (6) Flight Simulator and Associate Simulator Technicians and Technical Coordinators, and (7) Ground School and Pilot Simulator Instructors.  As stated above, the "CBA" refers collectively to the collective bargaining agreements for each class listed above.  The CBA for each class is substantially identical as to the TWU Equity and Early Separation.

23.     **The American Airlines Bankruptcy and Motion to Reject the Collective Bargaining Agreements.**  On November 29, 2011, American filed for Chapter 11 Bankruptcy Protection.  American moved under section 1113 of the Bankruptcy Code to reject all of the CBAs with TWU.  TWU opposed the motions and filed several proofs of claim for, among other things, pending grievances against

American.   On or about December 9, 2013, New American emerged from the Bankruptcy.

24.   **The Ratified CBA.**   While the section 1113 motions were pending, TWU and American negotiated changes to the Collective Bargaining Agreements, reaching substantially identical tentative agreements—between TWU and each class of craft workers—which were ratified by a vote of TWU members (collectively, the "Ratified CBA").   Important provisions in the Ratified CBA included (1) an agreed reduction in force (the "RIF"); and (2) the "Me, Too" provision that required American to give TWU equal concessions with other labor groups.

25.   **The RIF: Early Separation Prevents Involuntary Furloughs.**   In order to avoid involuntary furloughs under the RIF, the Ratified CBA provide for Early Separation, via the so-called "early out" option ("Early Out") and the "stand-in-stead" option ("SIS") (together, "Early Separation").

26.   **The Me, Too Letters.**   Each Ratified CBA included a Letter of Memorandum that was entitled a "Me, Too Provision." (the "Me, Too Letters")   All of the Me, Too Letters were tied to American's labor cost savings, both from TWU-represented employees, and in comparison with non-TWU employee groups, such as the Allied Pilots Association ("Pilot Union").   First, the Me, Too Letters required American to Meet with TWU International to "discuss and agree upon a proportionate reduction in projected labor costs savings" that would be equivalent to other employee groups. Second, the Me, Too Letters obligated American to meet with TWU and "discuss and agree upon an appropriate credit to the TWU based upon the level of labor cost savings

realized by the Company" from "reductions in TWU represented employees working under TWU agreements."  Thus, the Me, Too Letters obligated American to reduce labor costs for TWU employees proportionately with the Pilot Union and to give "credit" to TWU based on those labor cost savings.

27.    **Negotiations Under the Me, Too Letters.**    TWU International and American met to discuss the proper credit for the Me, Too Letters.  By the terms of the Me, Too Letters, the discussions had to revolve around the relative reductions in projected labor costs between TWU-represented employees and others, such as Pilot Union-represented employees.  The TWU Equity amount had to be based, at least in part, on comparison with the Pilot Union equity of 13.5%.  The only way this could have been done was to compare the relative labor rates and number of employees between the unions.  Thus, the full complement of the TWU members working at American must have been considered.  The calculus also had to involve comparing the savings to American through the RIF and Early Separation program.  Thus, the willingness of the proposed class members to take Early Separation must have helped to create the TWU Equity.

28.    **The Letter Agreement Quantifies the Amount of TWU Equity.**

American consummated negotiations over the Me, Too Letters in a letter agreement to Little (the "Letter Agreement").[1]  The Letter Agreement provided for equity credit in

---

[1] There are two substantially identical Letter Agreements, one for American Airlines and one for American Eagle. Each provided for payment of TWU Equity to TWU members. "Letter Agreement" refers collectively to both, since they are identical insofar as they concluded negotiations on the Ratified CBA and vested equity to TWU members working for American.

New American issued to holders of pre-bankruptcy, unsecured claims.   The Letter Agreement was expressly part of the Ratified CBA.   Therefore, All TWU-represented American employees became vested in the TWU Equity at the time of the Letter Agreement.

**29.   The TWU Equity and Early Separation Programs Were Simultaneously Created and Interdependent.**   Both programs were created in the Ratified CBA and neither could be lawfully implemented until the Bankruptcy Court approved the Ratified CBA.   In addition, the RIF necessarily reduced New American's projected labor costs and therefore affected the TWU Equity under the Me, Too Letter in the Ratified CBA.   There was no rational, fair, or non-discriminatory reason to implement the programs separately, but the Defendants did just that.

**30.   Defendants Enticed the Class To Take Early Separation Without Implementing the TWU Equity.**   Beginning on September 4, 2012, which was before the Bankruptcy court had approved the Ratified CBA, the TWU enticed and rushed TWU members to enroll in Early Separation.   There was no stated reason for such a headlong rush, and in fact many enrollees continued to work long after this enrollment period.   On information and belief, approximately 2,000 TWU members enrolled in Early Separation.

**31.   Defendants Refused To Advise TWU Members About Whether Early Separation Might Adversely Affect Their Receipt of the Vested TWU Equity.**   TWU announced - and crowed about - the TWU Equity simultaneously with announcing the Early Separation program.   When TWU members asked about whether Early Separation might adversely affect receipt of their vested share of the TWU Equity, the Defendants

refused to provide any information or guidance at all, even though the plan for TWU Equity distribution had to have been already considered, given the interlocking effect of projected labor costs savings via the RIF on the amount of TWU Equity.  For example, on September 27, 2012, Robert Gless ("Gless"), the TWU Deputy Director of the Air Transport Division, sent a letter to TWU members expressly refusing to give advice on whether to retire early and what effect such a choice might have on a member's rights to the TWU Equity distribution.  Even if Defendants needed time to develop the TWU Equity distribution plan, they should have likewise delayed implementation of Early Separation, so that TWU members could have been fully informed about both simultaneously-existing programs.  In that regard, even American Airlines put the RIF on hold until well into 2013.

    32.    **The Equity Distribution Committee.**    Defendants set up an Equity Distribution Committee (the "Committee") comprised of the presidents of the Local Union Defendants.[2]  The Committee secretly decided to exclude the proposed class from the TWU Equity, keeping the secret until the class had already enrolled in Early Separation.  Importantly, this decision was made in direct contravention of the advice from the TWU International President who had personally negotiated the TWU Equity amount under the Letter Agreement.

---

[2] The local unions being 502, 512, 513, 514, 541, 542, 567, 568, 570, 571, 572, 574, 575, 576, and 591. The TWU Equity Distribution committee included Donny Tyndall (Local 502), Sean Doyle (Local 512), Darrin Pierce (Local 513), Sam Cirri (Local 514), for American Airlines Jim Fudge (Local 541), John Plowman (Local 542), Larry Pike (Local 567), Tom Lee (Local 568), and Gary Peterson (Local 591).  For American Eagle, members included Dan Rivera (Local 570), Mark Szumylo (Local 574), Council Creech (Local 572), Jim Peterson (Local 574), Ron Nichols (Local 575), and Mike Rinaldi (Local 576).

**33.** **The Committee Goes Against the Man Who Got the TWU Equity in the First Place.**   As set forth above, the TWU International President (Little) negotiated and was the addressee of the Letter Agreement and best situated to evaluate how the TWU Equity should be distributed.   When he got wind of the Committee's inclination to discriminate against and exclude everyone who enrolled in Early Separation, he strenuously objected in an open letter to "All AA Presidents and Board":

> Since I negotiated the equity and the 1.7% "Me Too" which I consider a major plus for the members, I strongly recommend that it should be divided up equally to all those that ratified and accepted an early severance then or at a later date.   I am disappointed that a decision was made to cut out from the 1.7% those who are probably senior members that have made life decisions, and were TWU members through some of the darkest times.   I ask you my brothers to reconsider; it is not too late to do the right thing.

**34.** **The Committee's Decision To Deny Those Who Took Early Separation Their Vested Rights in the TWU Equity.**   In August 2013, the Committee formally announced that only persons employed on both November 29, 2011 (when American filed for bankruptcy), and July 26, 2013, would be eligible for distribution of the TWU Equity.   Accordingly, everyone who took Early Separation before July 26, 2013, was denied their vested rights to the TWU Equity.   Notably, anyone who separated from American after July 27, 2013, was entitled to the TWU Equity distribution.   Furthermore, the Pilots and Flight Attendants Unions, who had previously settled their collective bargaining agreements, did not exclude departing employees from their equity.

**35.** **Powell Appeals the Committee's Decision on His Behalf and for All others Similarly Situated.**   By letter dated September 18, 2013, Powell wrote to the

Equity Distribution Appeals Committee ("Appeals Committee") on his own behalf and on behalf of the proposed class, appealing the decision to exclude members of the class from the TWU Equity distribution.  The Appeals Committee stated that appeals would be decided in 30 days, absent a request for further information.  The Appeals Committee however failed to even acknowledge Powell's letter, request any further information, or otherwise explain to Powell the reason why it did not respond to his letter for over 60 days.  On December 2, 2013, Powell received a letter from the Committee informing him that his appeal was denied.  The letter was devoid of any reasoning or analysis other than repetition of the eligibility criteria that had been announced in August 2013.

## V. CLASS ACTION ALLEGATIONS

36.   **Class Definition.**  Powell brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of the following class (the "Class"): all TWU members who enrolled in Early Separation from American between November 29, 2011, and July 26, 2013.

37.   **Class Certification.**   This action may be maintained as a class action because:

      a.      The Class is so numerous that joinder of all members is impracticable;

      b.      There are questions of law or fact common to the Class;

      c.      The claims or defenses of the representative party is typical of the claims or defenses of the Class; and

      d.      The representative of the class will fairly and adequately protect the interests of the Class.

38.  **Injunction Class.**  The Class is properly certifiable pursuant to Fed. R. Civ. P. 23(b)(2) because TWU has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

39.  **Damages Class.**  The Class is properly certifiable pursuant to Fed. R. Civ. P 23(b)(3) because the questions of law and fact common to the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Among other things, each Class member's interest in individually controlling the prosecution of the claims herein makes it virtually impossible to assert those claims outside the class action context.  Moreover, there is no other litigation known by the undersigned counsel that asserts claims based on the facts in this controversy.  Concentrating litigation in this forum is desirable, as many affected TWU members are in this forum.  Finally, there are no likely difficulties in managing this case as a class action, and the Plaintiff's counsel is experienced in class actions.

40.  **Common Questions.**  The common questions of law and fact include at least the following:

   a.  The Class' rights under the Ratified CBA;

   b.  The Class' Rights under the Me, Too Letter, and the Letter Agreement;

   c.  The Defendants' duties to the Class under, among other things, the TWU Constitution, Local by-laws, the Ratified CBAs, the Me, Too Letter, the Letter Agreement, and applicable law;

d.      Defendants' investigation, research, and reasoning for the TWU

Equity distribution plan;

e.      Whether TWU has breached its duty of fair representation to the

Class members;

f.      Whether the Class members were entitled to take part in the TWU

Equity distribution;

g.      Whether Defendants should be enjoined from distributing the TWU

Equity pending the resolution of this suit; and

h.      The method and calculation of damages for members of the Class.

## VI.  FIRST CAUSE OF ACTION –
## BREACH OF THE DUTY OF FAIR REPRESENTATION –
## 29 U.S.C. §§ 151, *ET SEQ.* AND 45 U.S.C. §§ 151 *ET SEQ.*

41.     Powell re-alleges each of the preceding paragraphs as if set forth fully

herein.

42.     Defendants, jointly and severally, as the bargaining representatives of the

members of the Class, had a statutory duty under the RLA to fairly represent all

employees covered by the Ratified CBA and all letters, memoranda, or agreements

appurtenant thereto.   Defendants breached these duties and it was discriminatory,

arbitrary, capricious, and in bad faith for TWU to exclude the Class from the TWU

Equity because, among other things:

a.      The Class had vested rights in the TWU Equity under the Ratified

CBA, which the Class voted on and which created the right to the

Equity via the Me, Too Letter.   The TWU Equity and Early

Separation existed simultaneously and are not exclusive of one another.  Additionally, rights to the TWU Equity were a large portion of the basis of the bargain for the Class members' approval of the Ratified CBA.

**b.**     The simultaneously co-existing and interlocking Early Separation program and TWU Equity should have been implemented contemporaneously.  These two programs stemmed from the Ratified CBA's RIF and Me, Too provisions and there was no fair, non-discriminatory, good faith reason to demand enrollment in Early Separation without announcing how the TWU Equity distribution would work.  In fact, there is no rational way the TWU Equity could have been quantified without also considering who would participate.  Defendants must have anticipated excluding those who enrolled in Early Separation from the TWU Equity and affirmatively hidden this plan.  At the very least, Defendants should have delayed Early Separation enrollment until they announced that they proposed to exclude those persons from the TWU Equity.

**c.**     Defendants discriminated against the Class.  Not only did the Class help create the TWU Equity by participating in the projected labor cost savings to New American, they prevented an involuntary RIF. Defendants also failed to disclose to the Class the TWU Equity distribution plan before the Class enrolled in Early Separation.

**d.**     The Defendants used arbitrary and capricious eligibility dates for the TWU Equity.  First, Early Separation enrollment began as early as September 4, 2012, before the Bankruptcy Court approved the Ratified CBA.  The Defendants had no legal right to even extend such an offer.  Defendants then required Early Separation enrollment before announcing the decision on TWU Equity distribution, even though many Class members who enrolled worked well beyond the enrollment dates and American put the RIF on hold, showing that there was no need to have an early enrollment period.  On the back end, Defendants selected July 26, 2013 as a cutoff, after which persons leaving employment at American could participate in TWU Equity.  It appears this date was selected entirely due to the Committee's inexcusable secrecy and delay that put announcement of the TWU Equity distribution plan after the Class had been forced to decide about Early Separation.  To the extent that Defendants did not intentionally decide to harm and discriminate against Class, the dates Defendants selected for Early Separation enrollment and TWU Equity distribution eligibility are arbitrary and capricious.

**e.**     There is no rational, fair, non-discriminatory basis for excluding those who took Early Separation from the TWU Equity.  The Class prevented involuntary furloughs and therefore should be treated no worse than those who did not take Early Separation.  In that regard,

the Committee recognized that it would be unfair to exclude *involuntarily* furloughed employees from the TWU Equity distribution. Those who prevented involuntary furloughs should be treated the same.

f.    The Local Union Defendants improperly rejected the advice of the very person who negotiated and received the Letter Agreement that awarded the TWU Equity. Little advised the Committee not to exclude the Class and the Committee offered no rational, non-discriminatory basis for doing so.

g.    The TWU Equity amount had to have been based on comparison with the equity and pay rates and membership of other unions, and therefore the RIF and Early Separation had to have been considered in determining how to calculate the TWU Equity. Even if those subject to the RIF and Early Separation had been excluded from the TWU Equity calculation, that should have been revealed to the Class.

h.    The Defendants are improperly discriminating against the Class who voted on the Ratified CBA. Alternatively and in addition, Defendants improperly failed to obtain a vote on the TWU Equity distribution.

i.    The Defendants improperly failed to disclose the reasoning behind the TWU Equity distribution.

**j.**    The Class did not get consideration that would replace the TWU Equity. Early Separation involved a one-time payment to departing employees, and it appears that Defendants may argue that this one-time payment justifies exclusion of the Class from the TWU Equity. This argument fails, however, because there does not appear to have been any analysis of job opportunities for the Class and whether a one-time payment was better than if the Class had remained working under the Ratified CBA.

**43.**    As a direct and proximate result of Defendants' breach of the duty of fair representation, Powell and the Class have been damaged by their exclusion from the TWU Equity distribution in the amount of the TWU Equity that would have been distributed to the Class members had the Committee not discriminatorily excluded them, which is, on information and belief, approximately $32,500,000.00.

**44.**    It appears that TWU International may not have advocated some or all of the unlawful conduct and it apparently had no membership on the Committee. However, TWU International had a duty to prevent unlawful conduct by the Committee and the Local Union Defendants and is therefore jointly and severally liable.

**45.**    The damages set forth about are readily calculable and common to and typical among all Class members.

## VII.   <u>SECOND CAUSE OF ACTION – INJUNCTIVE RELIEF</u>

**46.**    Powell re-alleges each of the preceding paragraphs as if set forth fully herein.

47.     Powell and the Class are also entitled to a temporary restraining order and a preliminary injunction preventing distribution of the TWU Equity by Defendants pending a final decision on the merits in this case.  As an initial matter, Powell and the Class are likely to succeed on the merits.  Specifically, by excluding Powell and the Class from the TWU Equity, Defendants have clearly breached their statutory duties to Powell and the Class.

48.     Second, there is a substantial threat that failure to grant injunctive relief will result in irreparable injury to Powell and the Class for at least two reasons.  First, due to the stock-oriented nature of the TWU Equity, its complete distribution prior to a judicial determination of the rights of the Class to the TWU Equity and the obligations of Defendants regarding the Class would irreparably harm Powell and the Class because the TWU Equity comprises a specific *res*, namely stock in New American, that would be lost.  Further, on information and belief, while approximately 50% of the Equity was set to be distributed directly into the online share accounts of TWU members or potentially into their 401k accounts on December 9, 2013, another distribution is set to occur 120 days later.  If full distribution is allowed to take place, recovery of the TWU Equity at issue would be impossible, and there is no indication that Defendants have the resources to satisfy a $30 million-plus judgment. A temporary restraining order and preliminary injunction preventing further distribution of the TWU Equity would preserve the status quo sufficiently to address the concerns of Powell and the Class.

49.     Third, the balance of hardships weighs heavily in favor of Powell and the Class.  Specifically, distributing the remaining TWU Equity would cause significant and

irreparable harm to Powell and the Class.  Conversely, if the Court prevents further distribution of the TWU Equity, it would merely maintain the status quo.

**50.** Finally, a distribution of the TWU Equity prior to judicial relief would be both inequitable and against the public interest.  It is in the public interest to hold Defendants to their obligations to their members and to their obligations under federal law.  Accordingly, Powell and the Class seek a temporary restraining order and a preliminary injunction preventing Defendants from making any distribution of the TWU Equity pending the resolution of this suit and the Class's rights to the TWU Equity.

## VIII.  CONDITIONS PRECEDENT

**51.** Powell and the Class have fully complied with all contractual and other legal obligations, as well as exhausted their administrative remedies, prior to bringing this action, and/or all such obligations or conditions are excused.

## IX.  JURY DEMAND

**52.** Powell and the Class demand a trial by jury.

## X.  PRAYER FOR RELIEF

**53.** Powell, on behalf of himself and on behalf of the Class, requests the following relief:

    **a.** An order certifying the Class and appointing Plaintiff as representative of the Class and the undersigned counsel as Class Counsel;

    **b.** An injunction from the Court enjoining Defendants from any distribution of the TWU Equity pending resolution of this suit and a

final injunction that Defendants distribute the Class its share of the

TWU Equity;

**c.**    Actual damages suffered by Powell and the Class;

**d.**    Pre- and post-judgment interest; and

**e.**    Any other and further relief, general and special, legal and equitable,

to which Powell and the Class may be justly entitled.

Respectfully submitted,

By: /s/ Keith R. Verges
    Keith R. Verges
    Texas State Bar No. 20547650
    keith.verges@figdav.com
    Ryan K. McComber
    Texas State Bar No. 24041428
    ryan.mccomber@figdav.com

FIGARI & DAVENPORT, LLP
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (Fax)

ATTORNEYS FOR PLAINTIFF THOMAS A.
POWELL, individually and on behalf of all
others similarly situated